AUSA: Jun Xiang

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 51** |
| UNITED STATES OF AMERICA<br><br>            v.<br><br>VINCENT MEDINA,<br><br>                         Defendant. | **SEALED COMPLAINT**<br><br>Violations of 21 U.S.C. § 846, and<br>18 U.S.C. §§ 924(c), 924(o), and 2<br><br>COUNTY OF OFFENSE:<br>BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

      DANIEL CALLINAN, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

## COUNT ONE
### (Conspiracy to Distribute Narcotics)

      1.      From at least in or about November 2023 up to and including at least in or about December 2023, in the Southern District of New York and elsewhere, VINCENT MEDINA, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

      2.      It was a part and an object of the conspiracy that VINCENT MEDINA, the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

      3.      The controlled substance involved in the offense was a quantity of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

## COUNT TWO
### (Firearms Use, Carrying, and Possession)

      4.      From at least in or about November 2023 up to and including at least in or about December 2023, VINCENT MEDINA, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the drug trafficking crime charged in Count One of this Complaint, knowingly used and carried firearms, and in furtherance of such crime, possessed firearms, and aided and abetted the use, carrying, and possession of firearms, some of which were brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), (ii), (iii), and 2.)

**COUNT THREE**
**(Conspiracy to Use, Carry, and Possess Firearms)**

5.      From at least in or about November 2023 up to and including at least in or about December 2023, in the Southern District of New York and elsewhere, VINCENT MEDINA, the defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

6.      It was a part and an object of the conspiracy that VINCENT MEDINA, the defendant, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the drug trafficking crime charged in Count One of this Complaint, knowingly use and carry firearms, and, in furtherance of such crime, possess firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A).

(Title 18, United States Code, Section 924(o).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.      I am a Detective with the New York City Police Department and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as my review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

8.      As detailed below, VINCENT MEDINA, the defendant, participated in a drug-related shooting in the vicinity of Brook Avenue and East 137 Street on or about November 16, 2023. Prior to the shooting, MEDINA engaged in a verbal dispute with a group of rival drug dealers. Following further interactions between MEDINA and the rival drug dealers, MEDINA pulled out a gun and fired multiple shots at the rivals, one of whom shot back. Following the shooting, a co-conspirator not named herein ("CC-1") picked up the shell casings from the shooting. MEDINA and CC-1 were later arrested, both in possession of quantities of controlled substances, including cocaine.

9.      Below is a Google Map showing the intersection of Brook Avenue and East 137 Street in the Bronx, New York, and the surrounding neighborhood. Locations referenced in this Complaint are marked with black letters. The block that is south of East 137 Street and Brook Avenue, which contains green spaces, is the location of the Millbrook Houses, which includes 520 East 137 Street (which is marked as location "C").



10.     Based on my participation in this investigation, my review of documents, law enforcement records, and other evidence, including surveillance video recordings, and my conversations with other law enforcement officers, I have learned, in substance and in part, the following:

        a.      On or about November 16, 2023, at approximately 4:30 p.m.,[1] an individual wearing a green T-shirt, a green cap, and a black vest ("Dealer-1") and other men congregated at the corner of Brook Avenue and East 137 Street in the Bronx, which is marked location "A" in the map above.  As Dealer-1 stood at the corner, an elderly woman ("Customer-1") approached and appeared to ask Dealer-1 a question, prompting Dealer-1 to shake his head.  Customer-1 then began crossing East 137 Street.

        b.      As Customer-1 was crossing the street, two individuals known to me ("Dealer-2" and "Dealer-3") arrived on the corner and greeted Dealer-1.[2]

---

[1] The time stamps across different cameras were not synchronized, so the same events may have different time stamps across different vantage points.  Accordingly, the times in this Complaint are approximate.  I have confirmed the overall sequence of events by reviewing the same events across cameras.

[2] I recognize Dealer-2 and Dealer-3 because, in the course of performing my duties, including physical surveillance: (a) I have seen Dealer-2 in person approximately two dozen times since in or about 2017; (b) I have seen Dealer-3 in person approximately a half-dozen times since

    c. Customer-1, who was now in the middle of the street, accepted something from another man and returned to Dealer-1 with a wad of cash. Dealer-1 and Customer-1 met by a mailbox and—as Dealer-2 and Dealer-3 observed—Customer-1 appeared to give Dealer-1 money before walking away. Dealer-1 then remained at the mailbox, looking at his hands in a way consistent with counting money. Customer-1 returned to the mailbox, where Dealer-1 appeared to hand Customer-1 a small object.

    d. Dealer-1 then walked over to where Dealer-2 and Dealer-3 were standing and, in the course of speaking with them, handed Dealer-2 a small item. After about a minute, Dealer-3 gave something in return to Dealer-1. Throughout this interaction, Dealer-1, Dealer-2, and Dealer-3 repeatedly surveyed their surroundings, and they exchanged the items very quickly. Based on my review of the video surveillance summarized above, I believe that Dealer-1 sold drugs to Customer-1, and that Dealer-1 gave the proceeds of the sale to Dealer-2 and Dealer-3, who then supplied Dealer-1 with more drugs to sell.

    e. During the time that Dealer-1, Dealer-2, and Dealer-3 were engaged in these apparent drug transactions, VINCENT MEDINA, the defendant,[3] was standing across the street, on East 137 Street, between Brook Avenue and St. Ann's Avenue, which is marked as "B" on the map above. MEDINA (circled in orange) was standing with a group of men, and he was wearing a long-sleeved salmon shirt and khaki pants, as shown below. As Dealer-1, Dealer-2, and Dealer-3 were engaged in the interactions described above, MEDINA appeared to take a phone call and looked repeatedly in their direction. Other men in MEDINA's group also began looking in Dealer-2 and Dealer-3's direction.



---

in or about early 2023. In addition, I have reviewed law enforcement records containing photographs of both Dealer-2 and Dealer-3.

[3] I recognize MEDINA because, among other things, I interviewed MEDINA in person on or about November 30, 2023.

    f. After the call ended, MEDINA conferred with other men in his group and then began walking toward Dealer-2 (circled in red) and Dealer-3 (circled in yellow), meeting them at the corner marked as location "A" on the map. MEDINA then commenced a heated argument with Dealer-2, during which they pointed and gestured around them.



    g. At the conclusion of this apparent argument, at approximately 4:38 p.m., MEDINA crossed back to the other side of Brook Avenue to rejoin the group of men he had been standing with at the location marked as "B." As MEDINA walked, he appeared to make a phone call. At approximately the same time, another person ("CC-1") who was standing at the front entrance of 520 East 137 Street (the "Building")—which is part of the Millbrook Houses and marked as location "C" on the map above—accepted a phone call.

    h. After standing with his group for a few more minutes at location "B," MEDINA looked at his phone and met with CC-1 at the entrance of the Millbrook Houses—near the location marked as "D" on the map—across the street from where MEDINA had originally been standing.

    i. Following his meeting with CC-1, MEDINA returned to rejoin the group of men standing at location "B." MEDINA (circled in orange), as well as other members of this group, continued to stare in the direction of Dealer-2 and Dealer-3, who continued standing at location "A." Dealer-2 (circled in red) and Dealer-3 (circled in yellow) stared back and, at times, Dealer-2 gesticulated in the direction of MEDINA's group. Dealer-2 repeatedly used his cellphone and appeared to take a phone call.



j. At approximately 4:46 p.m., Dealer-2 and Dealer-3 were joined at the corner of East 137 Street and Brook Avenue by an individual known to me ("Dealer-4").[4] After DEALER-4 arrived, Dealer-2 spoke excitedly to Dealer-4, while pointing in the direction of MEDINA and the MEDINA's group.

k. Approximately one minute after the arrival of Dealer-4, CC-1, now riding a blue scooter, approached Dealer-2, Dealer-3, and Dealer-4. CC-1 appeared to exchange words with them. Dealer-2, Dealer-3, and Dealer-4 then walked away, northbound up Brook Avenue.

l. Following his discussion with Dealer-2, Dealer-3 and Dealer-4, CC-1 took another phone call. MEDINA and CC-1 then met up and spoke briefly on Brook Avenue, before traveling southbound together, with others from MEDINA's group, toward the Millbrook Houses. They returned to the front entrance of the Building shortly after 4:50 p.m.

m. A few minutes later, an individual known to me ("Rival Shooter-1"),[5] Dealer-2, Dealer-3, Dealer-4, and other individuals (the "Rival Group") followed MEDINA's group from Brook Avenue back to the Millbrook Houses. Dealer-2, Dealer-3, and Dealer-4 were wearing the same clothing they were seen wearing at earlier points in the videos, although Dealer-3 now wore a full-face black ski mask. Rival Shooter-1 and Dealer-2 walked ahead of the others in the group. Rival Shooter-1—whose face and clothing are more clearly visible from other camera

---

[4] I recognize Dealer-4 because, in the course of performing my duties, including physical surveillance, I have seen Dealer-4 in person approximately twenty times since in or about 2020.

[5] I recognize Rival Shooter-1 because, in the course of performing my duties, including physical surveillance, I have seen Rival Shooter-1 in person approximately forty times since in or about 2020, and I have participated in an interview of Rival Shooter-1. In addition, I have reviewed law enforcement records containing photographs of Rival Shooter-1.

angles discussed later in this Complaint—was wearing a gray zip-up sweatshirt with decorative black trim, a shiny black puffy jacket, and a gray knitted cap.

    n.  Rival Shooter-1 and Dealer-2 walked up toward the front entrance of the Building, where they were met by a group that included MEDINA, CC-1, and other individuals (the "Millbrook Group"). Dealer-3, Dealer-4, and others from the Rival Group soon joined. Rival Shooter-1 greeted MEDINA and others in the Millbrook Group. MEDINA appeared to address Rival Shooter-1, after which Dealer-2 appeared to address MEDINA, at times gesticulating forcefully. CC-1 appeared also to address Rival Shooter-1. In the still images below, MEDINA is circled in orange, CC-1 is circled in white, Rival Shooter-1 is circled in green, and Dealer-2 is circled in red.



    o.  As the group conversation continued, Dealer-2 suddenly punched MEDINA in the head.



7

p.   In response, MEDINA pulled out a gun and fired several shots in the direction of the Rival Group. The members of the Rival Group—including Rival Shooter-1, Dealer-2, Dealer-3, and Dealer-4—fled northbound, toward Brook Avenue.



q.   As Rival Shooter-1 was initially backing away, he reached inside of his jacket with his right arm. Rival Shooter-1 stumbled to the ground and, as a result, lagged somewhat behind the rest of the fleeing Rival Group. Accordingly, Rival Shooter-1 can be identified on video surveillance even from angles in which he is far away. Like others in the Rival Group, Rival Shooter-1 ran northbound toward East 137 Street.

r.   Rival Shooter-1 reached East 137 Street and turned left, running westbound, toward the intersection with Brook Avenue. As he rounded the corner, at the location marked "D" on the map, Rival Shooter-1 fired multiple gunshots in the direction of the entrance of the Building,

8

into which the Millbrook Group had fled. The stills below are from a video recording that shows approximately three muzzle flashes from the firing of a firearm at around location "D."





        s.        Approximately thirty minutes after the shooting, CC-1 started looking intently at the ground outside of the front entrance of the Building, at location "C," where MEDINA had fired the gunshots at the Rival Group. Multiple times, CC-1 bent over to pick something up off the ground. Before he bent over, CC-1 looked around to see whether anyone was observing him. CC-1 immediately put what he had just picked up inside his pocket. Based on my training and experience, I know that when a pistol fires a round of ammunition, it ejects the shell casing onto the ground, near where the gun was fired. Based on the video surveillance described above, I believe that CC-1 looked for, found, and successfully retrieved the shell casings

9

ejected from MEDINA's gun. Based on my review of law enforcement records, I know that police officers did not recover any shell casings near the front entrance of the Building.

    t. Police officers recovered three .380 caliber shell casings on the sidewalk of East 137 Street, near the location marked as "D" on the map, where Rival Shooter-1 fired gunshots in the direction of the Millbrook Group. In addition, a bullet struck the exterior of Max Health Pharmacy, a business located on the north side of East 137 Street, near location "B" on the map. That bullet partially shattered the pharmacy's window. Another bullet struck a parked vehicle on East 137 Street.

    u. On or about November 30, 2023, MEDINA was arrested on state charges and, at the time of arrest, MEDINA possessed on his person a baggie of an apparent controlled substance (the "Drugs"), among other items. The Drugs were laboratory-tested and found to contain cocaine.

    v. On or about December 6, 2023, CC-1 was arrested and, at the time of arrest, CC-1 possessed, on his person and on his scooter, approximately ten glassines of an apparent controlled substance, approximately 40 pills, and a round of ammunition, among other items.

   11. Based on my participation in the November 30, 2023 interview of VINCENT MEDINA, the defendant, including my observation of a portion of that interview conducted by other detectives, as well as my review of the videorecording of the entire interview, I know, among other things, the following:

    a. At the commencement of the interview, MEDINA was orally read his <u>Miranda</u> rights and he agreed to waive those rights and answer questions.

    b. In the early part of the interview, MEDINA stated, in substance and in part, that he had no recollection of being in any altercation, that he was not punched, and that he had brain damage and poor memory.

    c. In the middle part of the interview, MEDINA stated, in substance and in part, that he was approached by a group of men he did not know while he was standing in front of the Building and that they tried to bully him because they were trying to take over the block. He asserted that someone within this group of men shot at MEDINA unprovoked.

    d. As the interview continued, MEDINA acknowledged that at one point he pulled out what MEDINA claimed he thought was a BB gun, which he fired.[6] MEDINA claimed that another person had given him the purported BB gun immediately before MEDINA's confrontation with the opposing group. MEDINA acknowledged that he knew CC-1. In the early part of the interview, MEDINA denied ever using his phone to communicate with CC-1 in regard to the dispute. Toward the end of the interview, MEDINA acknowledged speaking on the phone with CC-1 in the course of the dispute.

---

[6]  Based on my training and experience, I know that a BB gun, when fired, feels dramatically different than a real gun. As discussed above, MEDINA fired multiple gunshots at the Rival Group.

   e.  MEDINA further stated, in substance and in part, that he sometimes carried drugs for others, but he denied selling drugs himself.

  12.  On or about December 15, 2023, the Honorable Ona T. Wang, U.S. Magistrate Judge, authorized a judicial search warrant of two cellphones (the "MEDINA Phones") seized from MEDINA at the time of his state arrest. Based on my review of the MEDINA Phones, I know that they contain, among other things, the following:

   a.  Photographs and at least one recording of MEDINA handling guns, including the below:



   b.  Text message communications with apparent coconspirators and drug customers, including, for example, (i) communications in which MEDINA is told that a "custy" (which, based on my training and experience, I know to be a shorthand for "customer") is waiting for him, (ii) communications in which MEDINA states that he needs his "toy" (which, based on my training and experience, I know to be a common codeword for gun), and (iii) communications in which the person with whom MEDINA is communicating asks for drugs.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of VINCENT MEDINA, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Daniel Callinan, by the Court, with permission
_____
DANIEL CALLINAN
Detective
New York City Police Department

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 4.1 and 41(d)(3), this
4th day of January, 2024

_____
JAMES L. COTT
United States Magistrate Judge